UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GOLDEN WEST TRADING, INC.,

Plaintiff,

-v-

WK KELLOGG NORTH AMERICA LLC, *et al.*,

Defendants.

25 Civ. 9835 (JPC)

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

Plaintiff Golden West Trading, Inc. ("GWT") brings this action against Defendants WK Kellogg North America LLC, WK Kellogg Co. (together "WKK"), and Ferrero International S.A. ("Ferrero"). Ferrero moves to dismiss all claims against it pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. WKK moves to dismiss all claims against it pursuant to Rule 12(b)(6). For the reasons that follow, the Court grants Ferrero's motion to dismiss for lack of personal jurisdiction. The Court denies WKK's motion to dismiss GWT's claim for breach of contract and grants WKK's motion as to GWT's remaining claims.

## I. Background

### A. Facts[1]

GWT designs, commercializes, and distributes food products. Am. Compl. ¶ 1. The Kellogg Company, which is not a party to this case, was a large food manufacturing company that

[1] The following facts, which are assumed true for the purposes of this Opinion and Order, are taken from GWT's Amended Complaint, Dkt. 57 ("Am. Compl."). *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners

sold cereals and snacks. *Id.* ¶ 2. In October 2023, the Kellogg Company underwent a restructuring, rebranding as Kellanova and spinning off its North American cereal business as Defendant WK Kellogg Co. *Id.* ¶ 6. Defendant WK Kellogg North America LLC is a wholly owned subsidiary of WK Kellogg Co. *Id.* ¶ 22. On September 26, 2025, Ferrero, a Luxembourg company "specializing in a variety of sweet treats including chocolates, candies, and ice creams," *id.* ¶¶ 10, 23, acquired WKK. *Id.* ¶ 81.

In August 2023, before the Kellogg Company's restructuring, GWT and the Kellogg Company entered into a license agreement (the "Agreement"), which granted GWT a license to the Kellogg Company's trademarks and intellectual property so GWT could sell ice cream products inspired by the Kellogg Company's brands. *Id.* ¶ 47. Several provisions of the Agreement are relevant to the present motions. Section 1.16 defines "Licensed Product" as "each product bearing the Property as set forth in the Data Sheet, including its packaging and other collateral materials, component parts and/or any items sold in conjunction with such product." Agreement § 1.16. The Data Sheet identifies two categories of "Licensed Product(s)": "Ice Cream: Dairy Based in varying sizes" and "Frozen Novelties: Dairy based hand-held ice cream bars, prepackaged single-serve cones or cups, or single-serve frozen desserts on a stick or ice cream sandwiches; packed in single-serve or family packs." *Id.*, Data Sheet (C). Section 2.1 provides that so long as GWT has sold "reasonable commercial quantities" and has not breached the

---

of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023) (applying the same standard to a motion to dismiss pursuant to Rule 12(b)(2)). The Court also draws on the contract at issue in this dispute, Dkt. 57-1 ("Agreement"), the First Amendment to the Agreement, Dkt. 57-2 ("First Amendment"), and the June 25, 2025 letters purporting to terminate the Agreement, Dkt. 57-3 ("Termination Notices"), which are attached as exhibits to the Amended Complaint. *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013) (explaining that when considering a motion under Rule 12(b)(6), a court may "consider any written instrument attached to the complaint" (citation omitted)).

Agreement, Kellogg will not grant rights to any third party to use the licensed intellectual property for use "in connection with the manufacture, marketing or distribution of ice cream or frozen novelty products." *Id.* § 2.1.

GWT had to obtain Kellogg's approval before selling any Licensed Product. Section 5.1 requires GWT to submit its proposals "for Kellogg's advance written approval, in Kellogg's sole and absolute discretion." *Id.* § 5.1. "All submissions will become the property of Kellogg." *Id.* § 5.1(6). And GWT "will not have any rights against Kellogg for damages or other remedies by reason of Kellogg's delay, failure or refusal to grant any approval referred to in this Section 5." *Id.* § 5.1(8).

Section 13.1 lists fourteen circumstances in which Kellogg may terminate the Agreement. Four are relevant here. Kellogg may terminate: (1) if "for any six-month period [GWT] does not diligently and commercially distribute and sell all categories of Licensed Products," *id.* § 13.1(iv); (2) if GWT "does not begin the bona fide manufacture, distribution and sale of the Licensed Products . . . on or before the [October 2024] Distribution Start Date," *id.* § 13.1(vii); (3) if GWT "does not fulfill its obligation to distribute, promote and advertise the Licensed Products . . . and does not cure such failure within 20 business days after written notice," *id.* § 13.1(xiii); and (4) if "during any 12-month period Kellogg gives more than two termination notices to [GWT] pursuant to this Section, regardless of cure," *id.* § 13.1(vi).

Two other provisions bear on these motions. Section 21 provides that New York law governs "[a]ll claims arising out of or relating to this Agreement," and that the parties waive any objection to personal jurisdiction in New York. *Id.* § 21. Section 23 provides that, "[i]n its respective dealings with the other Party under or in connection with this Agreement, each Party will act in good faith and fair dealing." *Id.* § 23.

Two months after the Agreement was signed, in October 2023, the Kellogg Company split into two companies. The Kellogg Company, renamed Kellanova, retained its snack brands while a newly formed company, WK Kellogg Co., took over its North American cereal business. Am. Compl. ¶ 60. As of October 1, 2023, Kellanova assigned the Kellogg Company's rights under the Agreement to WK Kellogg North America LLC, a subsidiary of WK Kellogg Co. *Id.* ¶¶ 6, 61; *see* First Amendment at 1. The parties documented that assignment in an amendment to the Agreement, which also revised other terms, including the royalty payment schedule. Am. Compl. ¶ 61; First Amendment at 1-2. The amendment took effect as of September 10, 2024, but it was signed months later: by GWT on or around January 21, 2025, and by WKK on or around March 7, 2025. Am. Compl. ¶ 61; First Amendment at 1, 4.

GWT began developing products under the Agreement. By the end of 2023, GWT was researching and developing both ice cream pints and frozen-novelty products. Am. Compl. ¶ 64. The ice cream pints were approved by WKK, and GWT "began selling them almost immediately." *Id.* ¶ 65. The novelties fared differently. According to GWT, "WKK repeatedly indicated that the commercialization of novelty ice cream products was not a priority." *Id.* ¶ 66. GWT submitted several novelty prototypes for approval, but despite giving positive feedback on at least some of them, WKK never gave final written approval for any novelty product sample. *Id.* ¶¶ 67-70, 109. The October 2024 Distribution Start Date passed without any novelty product receiving approval, and GWT never sold any frozen novelties under the Agreement. *See id.* ¶ 109.

Meanwhile, WKK was exploring a sale. According to the Amended Complaint, WKK had been in discussions with one or more potential acquirers since at least August 2024. *Id.* ¶¶ 79, 88. GWT alleges that the "largest suitors would likely have capabilities in the ice cream market," so the Agreement could present an obstacle for a purchaser that wanted to sell WKK-branded ice

cream. *Id.* ¶¶ 88-89. In February 2025, media outlets reported that Ferrero was considering a potential offer to acquire WKK. *Id.* ¶ 79. "[O]ne of the largest purveyors of packaged sweets and chocolates," Ferrero had in recent years expanded into ice cream. *Id.* ¶¶ 74-78. Ferrero began receiving due-diligence materials by May 1, 2025, gained access to a virtual data room by May 14, 2025, and held numerous meetings with WKK's senior management throughout May and June 2025. *Id.* ¶¶ 82, 85. On July 10, 2025, Ferrero's deal to acquire WKK for $3.1 billion was officially announced. *Id.* ¶¶ 10, 80. The acquisition closed on September 26, 2025, and entailed a merger of a Ferrero subsidiary with WKK, which became a wholly owned subsidiary of Ferrero. *Id.* ¶¶ 29 & n.3, 81 & n.25. Ferrero then replaced WK Kellogg Co.'s board of directors with its own designees. *Id.* ¶ 81.

While negotiations with Ferrero were ongoing, on June 25, 2025, WKK notified GWT that it was terminating the Agreement because GWT never manufactured, distributed, or sold any frozen novelties. *Id.* ¶¶ 90-98; *see* Termination Notices. It sent three notices under Section 13.1 stating that GWT's failure to sell frozen novelties triggered WKK's right to terminate under Sections 13.1(iv), (vii), and (xiii). Termination Notices at 5, 7, 9-10.[2] WKK also sent a fourth notice saying that the three other notices triggered its right to terminate under Section 13.1(vi). *Id.* at 12. GWT alleges upon information and belief that, by August 2024, WKK decided to withhold approvals of frozen novelties so that "if necessary to appease Ferrero or another acquiror, WKK could fabricate a breach by GWT to terminate the [Agreement]." Am. Compl. ¶ 88. And it alleges upon information and belief that Ferrero directed WKK to terminate the Agreement before the

[2] Citations to the Termination Notices are to the ECF-generated page numbers on Docket Number 57-3.

acquisition so that Ferrero could produce the products at issue, "rather than outsourcing to GWT and receiving only a royalty payment." *Id.* ¶¶ 85-86.

**B. Procedural History**

GWT commenced this action on November 25, 2025, by filing a complaint. Dkt. 1. On April 7, 2026, Defendants moved to stay discovery pending resolution of their motions to dismiss. Dkt. 46. The Court denied the motion to stay non-deposition and non-expert discovery but stayed depositions pending a decision on Defendants' anticipated motions to dismiss. *See* Minute Entry, Apr. 22, 2026. On April 29, Defendants filed their initial dismissal motions. Dkts. 50-53.

On May 20, 2026, GWT responded by amending as of right pursuant to Federal Rule of Civil Procedure 15(a)(1) and filing the operative Amended Complaint. Dkt. 57. The Amended Complaint pleads eight counts. Count 1 asserts a claim for breach of contract against WKK. Am. Compl. ¶¶ 102-126. Counts 2 through 5 are pleaded in the alternative to Count 1. Count 2 asserts a claim for breach of the implied covenant of good faith and fair dealing against WKK. *Id.* ¶¶ 127-135. Count 3 asserts a claim for promissory estoppel against WKK. *Id.* ¶¶ 136-141. Count 4 asserts a claim for unjust enrichment against all Defendants. *Id.* ¶¶ 142-151. Count 5 asserts a claim for quantum meruit against all Defendants. *Id.* ¶¶ 152-160. Count 6 asserts a claim for fraudulent misrepresentation against WKK. *Id.* ¶¶ 161-169. Count 7 seeks a declaration that the contract remains valid and enforceable against all Defendants. *Id.* ¶¶ 170-180. Finally, Count 8 asserts a claim for tortious interference with a contract, specifically, the Agreement, against Ferrero. *Id.* ¶¶ 181-191.

On July 1, 2026, WKK and Ferrero filed separate motions to dismiss the Amended Complaint.[3] WKK moved to dismiss all claims against it under Federal Rule of Civil Procedure 12(b)(6). Dkts. 65, 66 ("WKK Motion").[4] Ferrero moved to dismiss the claims against it for lack of personal jurisdiction under Rule 12(b)(2) and, alternatively, for failure to state a claim under Rule 12(b)(6). Dkts. 67, 68 ("Ferrero Motion"). Ferrero supported its motion with a declaration from one of its in-house lawyers, Bartłomiej Zientek, which amended a declaration he had submitted in connection with Ferrero's motion to dismiss the original complaint. Dkt. 68-1. On August 17, 2026, GWT filed a consolidated opposition to both motions. Dkt. 74 ("Opposition"). WKK and Ferrero replied on September 4, 2026. Dkts. 77 ("WKK Reply"), 78 ("Ferrero Reply").

The parties have also raised several discovery disputes. On July 28, 2026, GWT moved to compel discovery of documents concerning the negotiation and drafting of the contract and documents concerning the relationship between Ferrero and WKK. Dkt. 70. On October 9, 2026, GWT filed a second motion requesting a discovery conference to discuss outstanding discovery disputes. Dkt. 79. On October 19, 2026, Defendants filed a motion to compel GWT to produce responsive records of an additional eight custodians. Dkt. 82. The Court has advised the parties that, after ruling on Defendants' motions to dismiss, it will address any remaining discovery disputes. Dkt. 84.

## II. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(2), "a plaintiff must make a prima facie showing that jurisdiction exists." *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir.

---

[3] In light of the Amended Complaint and Defendants' new motions to dismiss, the motions to dismiss the original complaint, Dkts. 50, 52, are denied as moot. *See Carusillo v. Fansided, Inc.*, No. 20 Civ. 4766 (JPO), 2021 WL 4311167, at *2 n.2 (S.D.N.Y. Sept. 21, 2021).

[4] WK Kellogg Co. and WK Kellogg North America LLC filed a single motion that analyzes the claims against both entities jointly. *See* WKK Motion at 1.

2020) (citation omitted). This requires a plaintiff to "include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (citation omitted). "Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction." *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 216 (S.D.N.Y. 2019). But "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits," *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (citation omitted), and both the complaint and the affidavits should be construed in the light most favorable to the plaintiff, resolving all doubts in its favor, *see Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. This standard does not demand "detailed factual allegations," *id.*, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

## III. Discussion

### A. Claims Against Ferrero

Ferrero moves to dismiss for lack of personal jurisdiction and, alternatively, for failure to state a claim. GWT opposes and argues that the Court should order jurisdictional discovery if it finds personal jurisdiction to be lacking. The Court grants Ferrero's motion to dismiss for lack of

personal jurisdiction, and in doing so determines that jurisdictional discovery is not warranted. The Court thus does not reach Ferrero's alternative motion to dismiss under Rule 12(b)(6).

### 1. Personal Jurisdiction

"In the absence of a federal statute specifically directing otherwise, the district court can exercise only as much personal jurisdiction as is granted to its state counterpart." *Provencher v. Bimbo Foods Bakeries Distrib. LLC*, 175 F.4th 180, 186 (2d Cir. 2026) (quotation marks omitted); *see* Fed. R. Civ. P. 4(k)(1)(A). To exercise personal jurisdiction in these circumstances, "three requirements must be met: (1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (internal quotation marks omitted). But "[w]here the dispute is governed by a valid and enforceable forum selection clause, and the claim is included within the scope of the clause, we need not conduct a personal jurisdiction analysis because the clause constitutes consent to personal jurisdiction." *Yak v. BiggerPockets, LLC*, No. 20-3498, 2022 WL 67740, at *1 (2d Cir. Jan. 7, 2022) (summary order) (internal quotation marks omitted); *see D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.").

GWT argues that Ferrero is subject to this Court's exercise of personal jurisdiction only because of the Agreement's forum-selection clause. Opposition at 37-46. It does not identify any other basis for exercising personal jurisdiction over Ferrero. *See generally id.*; *see also* Am. Compl. ¶ 30 (alleging "personal jurisdiction over Ferrero because, following the merger, WKK operates as an alter ego, agent, and mere department or instrumentality of Ferrero"). While the Agreement does contain a forum-selection clause consenting to personal jurisdiction in New York,

Agreement § 21, Ferrero is not a party to that contract. Under New York contract law, "it is axiomatic that a contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 390 (S.D.N.Y. 2019) (citation modified).

GWT advances two related theories for why Ferrero should be bound by the Agreement's forum-selection clause despite being a non-signatory: Ferrero is "closely related" to WKK and, alternatively, WKK operates as Ferrero's alter ego and mere department. Opposition at 37-45. When a plaintiff seeks to bind a non-party to a forum-selection clause by virtue of its "close relationship" to a signatory, the "court should first analyze whether the non-party is otherwise bound to the agreement, as for example under the ordinary law of successor liability and alter ego applicable to all other contractual provisions." *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20 Civ. 967 (LJL), 2021 WL 918556, at *9 (S.D.N.Y. Mar. 10, 2021). Accordingly, the Court first considers GWT's argument that WKK is Ferrero's alter ego such that WKK's consent to the forum-selection clause should be imputed to Ferrero, before addressing whether the "closely related" test supports personal jurisdiction.

**i. GWT Has Not Adequately Alleged That WKK Is Ferrero's Alter Ego.**

"[A] forum selection clause may be enforced against a company's alter ego." *Platina Bulk Carriers Pte Ltd. v. Praxis Energy Agents DMCC*, No. 20 Civ. 4892 (NRB), 2021 WL 4137528, at *4 (S.D.N.Y. Sept. 10, 2021). "To prove alter ego liability, a party must first establish that the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own." *Brown v. Dolce & Gabbana USA Inc.*, No. 24 Civ. 3807 (NRB),

2025 WL 1919549, at *4 (S.D.N.Y. July 11, 2025) (internal quotation marks omitted). "The standard for establishing that entities are alter egos is relaxed where the alter-ego theory is used not to impose liability, but merely to establish jurisdiction." *George Moundreas & Co. v. Jinhai Intelligent Mfg. Co. Ltd*, No. 20 Civ. 2626 (VEC), 2021 WL 168930, at *8 (S.D.N.Y. Jan. 18, 2021) (quotation marks omitted). The plaintiff must still establish that "one entity was a shell for the other, *i.e.*, that one entity was subject to the complete domination of the other," but need not show "that the shell was used to perpetrate a fraud" as would be necessary to pierce the veil for liability purposes. *Alterseekers, Inc. v. BrandForce SF, LLC*, No. 12 Civ. 5392 (GRB), 2015 WL 5719759, at *6 (E.D.N.Y. Sept. 29, 2015) (internal quotation marks omitted).

"In determining whether an entity is properly understood as an alter ego for jurisdictional purposes, courts consider a variety of factors, including: (1) whether there was a failure to observe corporate formalities; (2) evidence of undercapitalization; (3) intermingling of . . . funds; (4) shared office space and phone numbers; (5) any overlap in ownership and directors; and (6) whether the corporation was used to perpetrate a wrongful act against the plaintiffs." *ERTC Express LLC v. Regulus Grp. LLC*, No. 25 Civ. 8490 (ER), 2026 WL 2837798, at *5 (S.D.N.Y. Sept. 22, 2026). Courts also consider "whether the alter egos and the corporation dealt with one another at arm's length" and "the payment or guarantee of debts of the alter egos by the corporation in question." *CesFin Ventures LLC v. Al Ghaith Holding Co. PJSC*, No. 21 Civ. 1395 (PGG) (SDA), 2022 WL 18859076, at *5 (S.D.N.Y. Dec. 10, 2022).

The parties first dispute what the relevant time period is for the alter-ego inquiry. In order to pierce the corporate veil under an alter-ego theory for purposes of liability, "[t]he alleged domination asserted as the basis for piercing the corporate veil must have occurred at or about the time of the complained-of transaction." *D'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd.*, 348

F. Supp. 3d 365, 391 (S.D.N.Y. 2018). Ferrero argues that the relevant period is thus when the Agreement was negotiated and performed. Ferrero Motion at 8-9. On the other hand, personal jurisdiction is determined as of the time a complaint is filed, and at least one judge of this District has concluded that "[f]or purposes of jurisdiction based on consent, . . . facts contemporaneous with the commencement of the litigation are important" though "events that took place years prior to the suit may well also be relevant." *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, No. 09 Civ. 6148 (VM) (MHD), 2012 WL 12932049, at *15 (S.D.N.Y. July 17, 2012), *report and recommendation adopted*, 896 F. Supp. 2d 320 (S.D.N.Y. 2012). GWT argues that personal jurisdiction can thus be based upon an alter-ego relationship that arose after the Agreement was executed. The Court need not definitively resolve this dispute because GWT's alter-ego theory fails under either approach.

To start, the circumstances at the time of contracting weigh against imputing WKK's consent to personal jurisdiction to Ferrero. GWT does not allege that WKK was Ferrero's alter ego when the forum-selection clause was executed in August 2023, when the Agreement was subsequently amended in March 2025, or even when WKK sent the Termination Notices in June 2025. Rather, GWT's theory is that WKK became Ferrero's alter ego "following the merger" in September 2025. Am. Compl. ¶ 30. GWT relies on *Cardell Financial* for the proposition that "facts contemporaneous with the commencement of the litigation are important," Opposition at 42, but the court there still looked to the non-signatory's involvement in the underlying deal. In *Cardell Financial*, the non-signatory was "intimately involved in the deal surrounding the [underlying agreements]," and there was evidence "pointing both to a lack of corporate formalities and intermingling of personal and corporate funds" during that period. 2012 WL 12932049, at

*26. Here, by contrast, Ferrero was an entirely separate company with no control over the Kellogg Company or WKK and had no involvement when the Agreement was negotiated and signed.

Nor do GWT's post-merger allegations establish an alter-ego relationship. The Amended Complaint contains no allegations that WKK and Ferrero failed to observe corporate formalities or shared office space and phone numbers. Nor does GWT allege or argue that there is any evidence of undercapitalization or that WKK and Ferrero did not negotiate the acquisition at arm's length. Instead, GWT argues that an alter-ego relationship exists because "there is substantial overlap in ownership, directors, and executives between Ferrero and WKK"; "WKK's finances are intertwined with and dependent upon Ferrero's"; and "Ferrero controls WKK's marketing and operations." Opposition at 42-44.

GWT's ownership allegations do not describe the sort of domination that establishes an alter-ego relationship. GWT alleges that Ferrero has appointed individuals to WKK's board of directors and other key positions. Am. Compl. ¶¶ 32-36. But "it is well established that the appointment of 'loyal board members' by a majority owner is not a basis for piercing the corporate veil, as such appointments are 'a due exercise of power incidental to ownership.'" *Koh v. Koo*, No. 22 Civ. 6639 (JMF), 2023 WL 5352786, at *3 (S.D.N.Y. Aug. 21, 2023) (quoting *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 58 (2d Cir. 2021)). Nor is it remarkable that an acquirer would place experienced personnel in leadership roles at a newly acquired subsidiary. *See Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 248 & n.38 (S.D.N.Y. 2000). And the most significant of GWT's governance allegations—the March 2026 announcement that Ferrero's Chief Executive Officer would also serve as President of WK Kellogg Co., Am. Compl. ¶ 36—post-dates the commencement of this action, so it carries little weight even under the time-of-filing rule GWT champions.

GWT's financial allegations likewise fall short. GWT alleges that WKK is one of Ferrero's "group brands" whose results are captured in Ferrero's consolidated financial statements. *Id.* ¶¶ 37-38. It also alleges that, under the merger agreement, Ferrero agreed to provide WKK funds to repay approximately $743 million in outstanding debts. *Id.* ¶ 38. But inclusion in a parent's consolidated financial statements is a common feature of the parent-subsidiary relationship and does not suggest that WKK is an alter ego. *See Raspberry Holdings LLC v. NextBank Int'l Inc.*, No. 24 Civ. 1529 (LJL), 2025 WL 438270, at *7 (S.D.N.Y. Feb. 7, 2025) ("It is not unusual for a subsidiary to have financial and accounting ties to its parent company, or to be functionally organized as part of a division of a parent company."); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) ("[B]ecause consolidated financial reporting is typical in a parent-subsidiary relationship, a mere department relationship cannot be established solely on the basis of such reporting." (quotation marks omitted)). Nor does the payment of WKK's debt support GWT's argument. "Evidence of the payment of debts on behalf of a company . . . can . . . be significant evidence of an alter ego relationship because it evidences control and a lack of regard for corporate formalities." *Classic Mar. Inc. v. Limbungan Makmur SDN BHD*, 646 F. Supp. 2d 364, 371 (S.D.N.Y. 2009). But the payment alleged here was a publicly disclosed term of the acquisition's financing structure. Am. Compl. ¶ 38. GWT points to no cases suggesting that a financing term negotiated at arm's length as part of an acquisition is the sort of "intermingling" of funds relevant to the alter-ego inquiry. And, unlike the cases on which GWT relies, the Amended Complaint does not allege facts about the significance of this payment to WKK's overall business or facts showing that WKK is dependent on Ferrero. *Cf. Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 121 (2d Cir. 1984)

(exercising personal jurisdiction over a parent where the subsidiary was "wholly dependent upon" the parent, which provided the subsidiary "with at least 71% of its debt").

Finally, GWT's allegations that Ferrero controls WKK's marketing and operations do not advance its argument. The Amended Complaint quotes Ferrero's website saying that "[t]he Ferrero Group manufactures, markets, and distributes the above WK Kellogg Co. breakfast cereal products." Am. Compl. ¶ 39. The "failure to distinguish between parent and subsidiary on a web page is [not] sufficient to show that the parent controls the subsidiary's marketing and operational policies." *J.L.B. Equities*, 131 F. Supp. 2d at 550. Similarly, the fact that "the parent decides to present several corporations on a website in a unified fashion, is insufficient to show lack of formal separation between two entities." *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 157 (S.D.N.Y. 2004). GWT's allegation carries particularly little weight here because, as GWT acknowledges, "Ferrero Group" is defined by Ferrero to mean "Ferrero International S.A. and its subsidiaries." Opposition at 44 n.12. Ferrero's website is entirely consistent with WKK, as one of Ferrero's subsidiaries, continuing to manufacture and market its product lines.

GWT alternatively argues that WKK is a "mere department" of Ferrero. That theory looks to four factors: "common ownership," the subsidiary's "financial dependency" on the parent, "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities," and "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Volkswagenwerk Aktiengesellschaft*, 751 F.2d at 120-22. The parties dispute whether this doctrine is relevant for determining whether a non-signatory has consented to a forum-selection clause. *See* Ferrero Reply at 7 n.3 (noting that the doctrine developed in the general-jurisdiction context). The Court need not decide that question. Beyond common ownership, which is present in every parent-

subsidiary relationship, GWT relies on the same allegations about governance, finances, and marketing that the Court has already found insufficient. *See* Opposition at 40-45.

Viewed together, GWT's allegations describe the ordinary integration of a newly acquired subsidiary into its parent's corporate family. They do not describe the kind of domination that would render WKK a mere shell whose consent can fairly be attributed to Ferrero.

**ii. The Closely-Related Test Does Not Establish Personal Jurisdiction.**

GWT's alternative theory—that Ferrero is so "closely related" to WKK that WKK's consent should be imputed to it—likewise fails. The Second Circuit has held that "a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory." *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013). This is because "the signatories to the contract have already assented to a forum selection clause and thus have agreed to litigate disputes relating to the contract in the chosen forum." *Id.* But the Second Circuit has not addressed how the "closely related" test applies where a signatory attempts to enforce a forum-selection clause against a non-signatory to establish personal jurisdiction. As this Court observed in another matter, "[i]n situations in which an ordinary agency or contract law analysis does not already attribute the consent of a signatory to a non-signatory, the Court is skeptical that the 'closely related' test can operate to extend the Court's personal jurisdiction over the non-signatory in question." *Villalobos v. Telemundo Network Grp. LLC*, No. 22 Civ. 7665 (JPC), 2024 WL 5008980, at *6 (S.D.N.Y. Dec. 6, 2024).

Where the closely-related test applies, "a non-signatory is 'closely related' to a signatory if enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the non-signatory sought to be bound." *Arcadia Biosciences*, 356 F. Supp. 3d at

395 (citation modified). This "is a fairly strict standard." *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 523 (S.D.N.Y. 2018), *aff'd*, 774 F. App'x 714 (2d Cir. 2019). "The requisite relationship has . . . been found where the non-signatory played an active role in the creation of the contract in which the forum selection clause is found, or an active role in a company that was a signatory." *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, No. 25 Civ. 1260 (JAV), 2025 WL 2916153, at *7 (S.D.N.Y. Oct. 14, 2025). Consistent with that focus, courts ordinarily assess the relationship as it existed when the contract was formed, and "[t]he vast majority of cases that have found a nonsignatory bound by a forum selection clause under the theory that they are 'closely related' to the dispute or the signatory, have done so where the non-signatory had a[n] . . . active role in the transaction." *Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 259 (E.D.N.Y. 2013) (collecting cases).[5] On the other hand, a few courts in this District have applied the closely-related doctrine "where the non-signatory had a particularly close relationship with a signatory, through . . . alleged breach of the agreement, such that enforcement of the clause was foreseeable." *R4 GL Acquisition LLC v. Glorieta LLC*, No. 25 Civ. 944 (NRB), 2026 WL 579181, at *7 (S.D.N.Y. Mar. 2, 2026).

[5] Various judges of this District have embraced such an analysis. *See, e.g.*, *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc.*, No. 25 Civ. 6936 (RA), 2025 WL 3442819, at *6 (S.D.N.Y. Dec. 1, 2025) (concluding that the "closely related" theory did not apply where there was no evidence "that [the non-signatory] was in concert with the signatories at the time the Individual Defendants signed the [agreements]" (quotation marks omitted)); *Villalobos*, 2024 WL 5008980, at *6 (finding that the non-signatory was not "closely related" where it "played no role in the negotiation, drafting, or execution of the [agreement]"); *Arcadia Biosciences*, 356 F. Supp. 3d at 390 (rejecting an argument that a forum-selection clause could bind a non-signatory that "was not an affiliate of the parties to the [agreement] at the time it was signed"); *cf. Haverhill Coke Co. v. Algoma Steel, Inc.*, No. 26 Civ. 4407 (JSR), 2026 WL 2348417, at *4 (S.D.N.Y. Aug. 13, 2026) (finding that a non-signatory was bound by a forum-selection clause signed by its parent where the non-signatory "had an active role in the transaction between the signatories").

The closely-related test is not satisfied here. GWT does not allege that Ferrero was closely related to WKK or the underlying contract at the time the forum-selection clause was executed. As in *Villalobos*, Ferrero "played no role in the negotiation, drafting, or execution of the [Agreement]." *Villalobos*, 2024 WL 5008980, at *6. Nothing suggests that Ferrero even knew of the Agreement when it was executed, or anticipated being haled into suit in New York for its violation. GWT's allegations about the relationship between Ferrero and WKK rest entirely on a relationship that arose years after the Agreement was executed. Opposition at 38.

GWT's strongest argument for applying this doctrine is the allegation that WKK sought to terminate the Agreement in concert with and at the behest of Ferrero. Am. Compl. ¶ 186; Opposition at 38-40. In *Seagrape Investors LLC v. Tuzman*, the Honorable Ronnie Abrams applied the closely-related doctrine to exercise personal jurisdiction over a non-signatory that had "received copies" of a contract containing a forum-selection clause and then "allegedly acted 'in concert' with the signatories . . . while aware of its terms" to "induce" and "intentionally procure[]" the signatories' breach. *Seagrape Invs. LLC v. Tuzman*, No. 21 Civ. 7517 (RA), 2024 WL 4337448, at *7 (S.D.N.Y. Sept. 26, 2024) (citation modified). GWT argues that similar reasoning applies here. Opposition at 40; *see* Am. Compl. ¶¶ 184, 186 (alleging that "Ferrero became aware of the [Agreement], including all of its terms," and then "directed WKK personnel to breach the [Agreement] with GWT").

GWT contends that under *Seagrape Investors*, a non-signatory may become bound by a jurisdictional clause if it, "acting in concert with [a signatory], procured [the signatory's] breach of the [Agreement]." Opposition at 38. Even if that is correct, GWT has not adequately alleged that Ferrero procured WKK's alleged breach, or that it did so "in concert" with WKK. GWT's accusation that Ferrero directed WKK to terminate the Agreement, which is pleaded on

information and belief, Am. Compl. ¶ 186, rests entirely on speculation built on thin supporting factual allegations. GWT infers that Ferrero instructed WKK to terminate the Agreement based solely on the issuance of the Termination Notices the day after Ferrero's last meeting with WKK's management discussing the acquisition and on Ferrero's ambitions in the ice cream business. And this argument is even undercut by GWT's own allegations. While GWT's jurisdictional argument asserts that Ferrero induced the termination, the Amended Complaint alleges that, "no later than the end of 2024," WKK had resolved not to approve GWT's novelty products so that it could appease a potential acquirer, Am. Compl. ¶¶ 87, 89. That was months before Ferrero is alleged to have had any involvement with WKK. *See id.* ¶ 79.

Moreover, GWT's allegations bear little resemblance to those that sufficed in *Seagrape Investors* to establish that the non-signatories were "acting in concert" with the signatories. There, the non-signatories were the signatories' creditors through a series of litigation loans, and allegedly had "the ability to influence the conduct of" the signatory entities. *Seagrape Invs.*, 2024 WL 4337448, at *16. They funded and directed the signatories' earlier lawsuit over the same agreement, including by "select[ing] the [signatories'] counsel and approv[ing] and pa[ying] all legal bills." *Id.* at *3, *7. And the alleged breach itself concerned a financing agreement, entered into at the non-signatories' "behest," that granted an entity the non-signatories controlled a $5 million lien on the signatories' project. *Id.* at *3, *7. Here, by contrast, Ferrero was at most a prospective acquirer of WKK when the Termination Notices issued. GWT does not allege that Ferrero had any ownership interest in, creditor relationship with, or contractual relationship with WKK at that time, or that Ferrero was a party to the Termination Notices. So even crediting GWT's allegation that Ferrero urged WKK to terminate the Agreement, the relationship between

them was too attenuated to make it foreseeable that Ferrero would be bound by WKK's forum-selection clause.

**2. Jurisdictional Discovery**

GWT alternatively requests jurisdictional discovery. Opposition at 46-48. A district court has "considerable procedural leeway" in resolving a Rule 12(b)(2) motion, including whether to "permit discovery in aid of the motion." *Dorchester Fin. Sec.*, 722 F.3d at 84 (citation omitted). A court may order jurisdictional discovery where the plaintiff has made a "sufficient start" toward establishing jurisdiction, even if it has not yet made a *prima facie* showing. *Doe v. Telemundo Network Grp. LLC*, No. 22 Civ. 7665 (JPC), 2023 WL 6259390, at *11 (S.D.N.Y. Sept. 26, 2023) (citation omitted). But a court need not do so where the plaintiff's jurisdictional allegations are conclusory or where the discovery sought could not cure their deficiency. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185-86 (2d Cir. 1998).

Jurisdictional discovery is not warranted here because none of the facts GWT seeks to bolster its allegations would establish that Ferrero consented to jurisdiction in this forum. GWT's alter-ego allegations, even if credited, describe only the ordinary integration of a newly acquired subsidiary. GWT offers no reason to believe that discovery would reveal the kind of domination that would make WKK Ferrero's alter ego. At most, jurisdictional discovery might support GWT's allegations about the importance of the merger to WKK and post-merger conduct. But GWT has not explained how non-public information would remedy its insufficient jurisdictional allegations, and such evidence would not change Ferrero's lack of a relationship with WKK when WKK became bound by the forum-selection clause or when it issued the Termination Notices. And even if GWT's interpretation of the closely-related doctrine were correct, jurisdictional discovery would not support applying it here, where GWT's own allegations are that the close

relationship arose years after the Agreement was executed and months after WKK purported to terminate it. To be sure, courts in this Circuit frequently order jurisdictional discovery into whether a non-signatory is an alter ego of or closely related to a signatory. *See* Opposition at 46 (collecting cases). Yet courts still decline to order jurisdictional discovery where plaintiffs "have not made out a colorable claim of personal jurisdiction" and do not "identify what facts they could uncover through discovery that would support the exercise of personal jurisdiction." *Koh*, 2023 WL 5352786, at *4 n.5 (internal quotation marks omitted).

* * *

GWT's request for jurisdictional discovery is denied, and Ferrero's motion to dismiss for lack of personal jurisdiction is granted. Ferrero is therefore dismissed as a Defendant in this action, Counts 4, 5, and 7 are dismissed without prejudice as to Ferrero, and Count 8, which is pleaded only against Ferrero, is dismissed without prejudice.

### B. Claims Against WKK

WKK moves to dismiss each of the seven claims against it. The Court concludes that GWT has plausibly alleged a breach of contract in Count 1, but that its claims against WKK in Counts 2 through 6 duplicate that breach-of-contract claim. The Court further declines to exercise jurisdiction over the declaratory-judgment claim in Count 7.

#### 1. Breach of Contract (Count 1)

The Amended Complaint plausibly pleads a claim for breach of contract against WKK based on the Termination Notices. To state a claim for breach of contract under New York law, a complaint must allege "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of [the] defendant to perform; and (iv) damages." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal quotation marks omitted). There is no dispute as to the first and fourth elements. WKK agrees that there was a valid contract

between it and GWT. *See* WKK Motion at 18 ("the parties have a valid, binding contract"). And GWT has plausibly alleged that it was damaged by WKK's conduct. *See, e.g.*, Am. Compl. ¶¶ 17, 101, 122-124.

The second and third elements are intertwined. GWT alleges that WKK breached the Agreement by sending the Termination Notices and purporting to terminate it. Am. Compl. ¶ 106.[6] As discussed below, the Termination Notices cited GWT's failure to sell the frozen-novelty products by October 2024. *See* Termination Notices at 5, 7, 9-10. The parties dispute whether that failure triggered the provisions permitting WKK to terminate the Agreement. GWT further argues that "[e]ven if GWT's failure to sell frozen-novelty products provided grounds for termination . . . , WKK cannot invoke that failure to terminate the [Agreement]" because WKK itself caused it. Opposition at 15. Whether each of GWT and WKK adequately performed thus is an interwoven question.

The four Termination Notices each invoked a different provision of Section 13.1. *See supra* I.A. Three relied directly on GWT's failure to sell frozen novelties: Section 13.1(iv), which permits termination if, for any six-month period, GWT does not "diligently and commercially distribute and sell all categories of Licensed Products," Termination Notices at 5; Section 13.1(vii), which permits termination if GWT does not "begin the bona fide manufacture, distribution and sale of the Licensed Products" by October 2024, *id.* at 7; and Section 13.1(xiii), which permits termination if GWT does not "fulfill its obligation to distribute, promote and advertise the Licensed

[6] GWT also alleges that WKK breached by failing to consider GWT's proposals for frozen novelties, by granting to Ferrero a right to use the property in the Agreement, and by failing to provide ingredients as required by the Agreement. Am. Compl. ¶¶ 107-123. GWT "need only plausibly plead one theory for the claim to survive dismissal." *Talkdesk, Inc. v. Unique Travel Corp.*, No. 23 Civ. 9543 (JPC), 2024 WL 4904684, at *3 n.5 (S.D.N.Y. Nov. 27, 2024). Because the Court concludes that GWT has stated a claim based on the Termination Notices, it does not decide at this stage whether GWT's remaining theories also state a claim.

Products" and fails to cure within twenty business days of notice, *id.* at 9-10. The fourth notice invoked Section 13.1(vi), which permits termination if WKK issues more than two termination notices within a twelve-month period. *Id.* at 12. All four notices thus rest on GWT's failure to distribute frozen novelties. The questions are whether that nonperformance gave WKK a right to terminate the Agreement, and if so, whether WKK may rely on it.

The parties disagree about whether Sections 13.1(vii) and (xiii) permit WKK to terminate if GWT has begun manufacturing, distributing, and selling one category of Licensed Products (*i.e.*, ice cream pints) but not the other (*i.e.*, frozen novelties). *Compare* WKK Motion at 6-7, *with* Opposition at 12-14. The Court need not resolve that dispute at this point because Section 13.1(iv) permits WKK to terminate "[i]f for any six-month period [GWT] does not diligently and commercially distribute and sell *all* categories of Licensed Products." Agreement § 13.1(iv) (emphasis added). "All" categories of Licensed Products encompasses both ice cream pints and frozen novelties, and whatever latitude the word "diligently" may afford in close cases, it cannot be stretched to cover the absence of *any* production or sales. GWT acknowledges it never manufactured, distributed, or sold a single frozen-novelty product in the six-month period before the June 2025 Termination Notices. *See* Am. Compl. ¶ 109. Absent some basis to excuse GWT's non-performance, WKK had the right to terminate under Section 13.1(iv).

Nevertheless, GWT has plausibly alleged that WKK may not rely on Section 13.1(iv) or, for that matter, Sections 13.1(vii) and 13.1(xiii) assuming WKK's reading prevails. GWT alleges that WKK, acting in bad faith, prevented the frozen-novelty sales. Under New York's prevention doctrine, "a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party itself." *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008) (citation modified); *see Kooleraire Serv. & Installation*

*Corp. v. Bd. of Educ. of City of New York*, 268 N.E.2d 782, 784 (1971) ("The general rule is . . . that a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."). The doctrine applies "where a party takes steps in bad faith to cause the condition precedent's failure." *Macklowe Inv. Props. LLC v. MIP 57th Dev. Acquisition LLC*, 243 N.Y.S.3d 43, 45 (1st Dep't 2025). It creates "an *implied* contractual obligation, similar to—and perhaps rooted in—the implied covenant of good faith and fair dealing," and "exists to serve the intent of the parties." *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 529 (2d Cir. 2005).

Courts in this Circuit have applied the prevention doctrine to bar a party from invoking a contractual termination right where that party wrongfully caused the nonperformance on which the termination rests. In *St. Christopher's, Inc. v. JMF Acquisitions, LLC*, No. 20-3808-cv, 2021 WL 6122674 (2d Cir. Dec. 28, 2021) (summary order), for example, the seller under a contract for the sale of land invoked a provision giving it "the option to terminate the contract if [the buyer] failed to obtain the necessary government approvals by March 4, 2018," *id.* at *4. The buyer had not obtained the necessary approvals by that date, but it alleged that the seller had obstructed the approval process. *Id.* The Second Circuit held that to invoke the prevention doctrine at the pleading stage, the buyer "need only allege that [the seller] materially hindered [the buyer's] ability to obtain the requisite government approvals in a timely manner." *Id.* Because, as alleged, the buyer had done so, "application of the [prevention] doctrine would prevent [the seller] from relying on [the buyer's] failure to obtain the requisite government approvals to terminate the contract." *Id.* Judges of this District have reached similar conclusions. *See, e.g.*, *Am. Railcar Indus., Inc. v. GyanSys, Inc.*, No. 14 Civ. 8533 (AT), 2015 WL 5821636, at *1-2 (S.D.N.Y. Sept. 9, 2015) (holding that a party that terminated a contract "for cause" for missed contract milestone dates

could not rely on those missed deadlines "to justify its termination of the contractual relationship," where the terminating party's own conduct caused them); *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 Civ. 432 (LAP), 2008 WL 650403, at *6-7, *10-11 (S.D.N.Y. Mar. 7, 2008) (holding that allegations that the defendants frustrated the plaintiffs' performance would, if proven, preclude exercise of even "an unconditional right to terminate").

GWT's allegations fall squarely within these principles. WKK relies on GWT's failure to distribute or sell frozen-novelty items as its basis for terminating the Agreement. *See* WKK Motion at 5-7; Termination Notices at 5, 7, 9-10. But GWT alleges that WKK prevented it from distributing or selling such frozen-novelty items by withholding approvals in bad faith. *See* Am. Compl. ¶¶ 66-71, 93, 113, 140. Accordingly, GWT has alleged that WKK "materially hindered [GWT's] ability" to perform and that WKK should not be permitted to rely on that non-performance to terminate the contract. *St. Christopher's*, 2021 WL 6122674, at *4.

WKK's arguments to the contrary do not support a different conclusion. First, WKK invokes the principle that "[w]hen a contract party cites a proper basis for termination, courts do not look behind the reasons given to inquire into motive." WKK Motion at 8 (citing *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 470 (S.D.N.Y. 2013)). That is true as a general matter, but the prevention doctrine addresses the predicate question of whether a party has identified "a proper basis for termination" at all. In other words, the prevention doctrine asks whether WKK wrongfully caused the nonperformance that gave rise to a termination right, not why WKK chose to exercise that right. *See Ixe Banco*, 2008 WL 650403, at *7-8 (applying the prevention doctrine while recognizing that allegations of an "'improper' motive for termination are irrelevant to the breach of contract inquiry").

Second, WKK argues that the Agreement "did not require WKK to approve GWT's proposed products," and the prevention doctrine may not be used "to achieve a right denied under the terms of the parties' agreement." WKK Reply at 9 (citing *OKL Holdings, Inc. v. Abercrombie & Fitch Stores Inc.*, 203 N.Y.S.3d 52, 54 (1st Dep't 2024)). But GWT invokes the doctrine to prevent WKK from relying on nonperformance that WKK allegedly caused in bad faith, not to compel approval of its products.[7] *OKL Holdings*, which WKK relies on, illustrates the distinction. There, a lease would take effect only once a consent form was signed by all parties, including the defendant, and the defendant never signed it. *OKL Holdings*, 203 N.Y.S.3d at 54. The First Department rejected the plaintiff's prevention argument because the defendant "ha[d] not prevented any other person from performing, and ha[d] violated no express or implied obligation"; it had "merely declined to execute" a document "which it had no duty to execute." *Id.* Here, by contrast, GWT does allege that WKK prevented its performance, while WKK seeks to rely on exactly that non-performance as a basis for termination.

Nor does Section 5.1's grant to the Kellogg Company of "sole and absolute" discretion over the approval process change the analysis. Whether WKK had a right to deny approval under Section 5.1 is a separate question from whether it had the right to terminate under Section 13 based on conditions that WKK caused. It is no answer to say that WKK had a right to deny approval, because "[w]hen it applies, the prevention doctrine requires a party to refrain from *exercising a contractual right in bad faith*—arbitrarily, irrationally or malevolently." *O.F.I. Imps. Inc. v. Gen. Elec. Cap. Corp.*, No. 15 Civ. 7231 (VEC), 2017 WL 6734187, at *3 (S.D.N.Y. Dec. 29, 2017) (emphasis added and internal quotation marks omitted). Applying the prevention doctrine here

[7] The Court does not decide here whether a bad-faith refusal to approve would be independently cognizable in a breach-of-contract action.

also is not at odds with the terms of the Agreement, which expressly obligates each party to "act in good faith and fair dealing." Agreement § 23. And the Agreement's lengthy and detailed termination clause would make little sense if the parties intended for WKK to be able to use its discretion under Section 5.1 to circumvent those protections and terminate the Agreement at-will.

That is not to say that GWT will ultimately prevail at summary judgment or at trial. To invoke the prevention doctrine, "some intent must be proved." *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 470 (S.D.N.Y. 2007). The "cornerstone" of the prevention doctrine is "that a party must prevent the occurrence of the condition in bad faith or wrongfully." *MCI LLC v. Rutgers Cas. Ins. Co.*, No. 06 Civ. 4412 (THK), 2007 WL 4258190, at *10 (S.D.N.Y. Dec. 4, 2007). Determinations as to whether a party has acted in bad faith "generally present factual questions inappropriate for resolution on a motion to dismiss." *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006). Further discovery may shed light on whether WKK refused to consider GWT's frozen-novelty prototypes in bad faith in order to manufacture a basis for termination. *See* Am. Compl. ¶ 110. But at the motion-to-dismiss stage, GWT's allegations that some of the prototypes "were received favorably by WKK," and that WKK indicated no reformulation was needed for several of them, yet still never granted final approval, make GWT's theory at least plausible. *Id.* ¶¶ 68-70.

Accordingly, WKK's motion to dismiss is denied as to GWT's breach-of-contract claim in Count 1.

**2. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 2)**

The Court grants WKK's motion to dismiss GWT's implied-covenant claim in Count 2 as duplicative of its breach-of-contract claim in Count 1. "Under New York law, implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included." *JN Contemp. Art LLC v. Phillips*

*Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022) (internal quotation marks omitted). "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Accordingly, a claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of a breach-of-contract claim "when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 50 (1st Dep't 2010)).

GWT's implied-covenant claim is based on the same facts and seeks identical damages as the breach-of-contract claim. Both claims are based on allegations that WKK refused to consider in good faith approving GWT's frozen novelties for sale. *Compare* Am. Compl. ¶¶ 106-110, *with id.* ¶¶ 130-134. Both claims identify GWT's product development costs and lost profits as damages. *Compare id.* ¶ 124, *with id.* ¶ 135. GWT's own brief underscores the unity between its covenant and contract claims by analyzing them together. *See* Opposition at 29 ("For the reasons set forth in Section I.B above [discussing the breach-of-contract claim], GWT has sufficiently alleged that WKK failed to consider in good faith approving GWT's submissions for proposed frozen-novelty products.").

GWT's reliance on *Spinelli v. National Football League*, 903 F.3d 185 (2d Cir. 2018), does not save the claim. Opposition at 29. *Spinelli* permits an implied-covenant claim to be pleaded in the alternative where "there is a dispute over the meaning of the contract's express terms." *Spinelli*, 903 F.3d at 206. GWT argues that this is the case here because the parties "dispute the meaning of the express terms of Sections 5.1, 6.3, and 23 and the scope of WKK's discretion thereunder."

Opposition at 29. But there is no reading of those provisions under which the implied-covenant claim is not duplicative. Section 23 expressly obligates each party to act "in good faith and fair dealing" in its dealings under the Agreement. Agreement § 23. GWT argues that this provision should be read more expansively than the implied covenant, Opposition at 22-23, while WKK argues that "expressing the covenant of good-faith and fair dealing in the [Agreement does not] expand it beyond the settled limits that govern the implied covenant," WKK Motion at 8. No party has suggested that Section 23 is narrower than the implied covenant, so however the parties' dispute is resolved, the implied-covenant claim would not reach conduct that the express covenant does not. Count 2 thus adds nothing that Count 1 does not already encompass and is dismissed as duplicative.

**3. Quasi-Contract Claims (Counts 3, 4, and 5)**

GWT next pleads claims for promissory estoppel (Count 3), unjust enrichment (Count 4), and quantum meruit (Count 5). Am. Compl. ¶¶ 136-160. Each is expressly pleaded in the alternative to GWT's breach-of-contract claim in Count 1. The Court agrees with WKK that these three Counts are duplicative of Count 1, and grants WKK's motion to dismiss with respect to Counts 3 through 5.

New York law does not permit a party "to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). Thus, in New York, claims of "unjust enrichment and promissory estoppel are ordinarily precluded if a valid and enforceable written contract, even an implied contract, governs the relevant subject matter." *Goldberg v. Pace Univ.*, 88 F.4th 204, 214 (2d Cir. 2023) (citation modified). The same is true of quantum-meruit claims. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,

418 F.3d 168, 175 (2d Cir. 2005) ("New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim.").

GWT argues, however, that "[a] plaintiff may plead promissory estoppel, unjust enrichment, and quantum meruit in the alternative." Opposition at 49. "[I]t is true that a plaintiff may plead [quasi-contract] claims in the alternative if there is a dispute over the existence, scope, or enforceability of the putative contract." *Goldberg*, 88 F.4th at 214-15 (internal quotation marks omitted). "The Federal Rules specifically allow pleading in the alternative." *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 202 (2d Cir. 2023) (citing Fed. R. Civ. P. 8(d)(2)). Accordingly, a plaintiff faced with an uncertainty as to the existence, scope, or enforceability of a contract may *plead* contract and quasi-contract claims in the alternative even though it may not *recover* on both. *Id.* at 201-02. But where "there is no such dispute," the quasi-contract claims should be dismissed as duplicative. *Goldberg*, 88 F.4th at 215.

The Second Circuit recently clarified that "a plaintiff need not expressly allege in its complaint a dispute over the existence, scope, or enforceability of the putative contract . . . in order to plead an alternative quasi-contract theory of liability." *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, 183 F.4th 78, 101 (2d Cir. 2026) (internal quotation marks omitted). While such specificity may be required at the remedies stage, a plaintiff does not have to "expressly plead facts undermining one theory in order to also pursue an alternative theory." *Id.* Rather, "[a]t the pleading stage, it is enough that the complaint alleges facts sufficient to state a quasi-contract claim, standing alone, regardless of whether the complaint also asserts a contract claim." *Id.* *Northwell Health* illustrates that quasi-contract claims are not duplicative where the defendants dispute the existence of the contract or "argue that they are not parties to" it, even if

the plaintiff alleges that an enforceable contract exists. *Id.* at 100 (internal quotation marks omitted). The Court therefore must consider WKK's arguments when evaluating whether there is a dispute over the existence or scope of the Agreement.

Here, there is no such dispute between GWT and WKK. WKK acknowledges that the Agreement was binding, valid, and enforceable. WKK Motion at 18 ("the parties have a valid, binding contract"). And GWT's only asserted dispute is hypothetical: it contends that the Agreement would be "illusory and unenforceable" were the Court to accept WKK's position that it had no obligation to even consider GWT's submissions in good faith. Opposition at 3, 49. But GWT points to no authority suggesting that the contract would be rendered illusory and unenforceable under WKK's reading.[8]

Moreover, the Agreement covers the dispute over GWT's quasi-contract claims. The promissory-estoppel claim is based on WKK's promise "that it would act reasonably in approving novelty ice cream products for GWT to sell," Am. Compl. ¶ 138, but the Agreement expressly governs the approval process, Agreement § 5.1. The unjust-enrichment and quantum-meruit claims allege that WKK was enriched by access to the product samples, recipes, package designs, and other information GWT provided "[a]s part of the product approval process." Am. Compl. ¶¶ 146, 155. But that too is covered by the Agreement. *See* Agreement § 5.1(6) ("All submissions will become the property of Kellogg"). Likewise, while the quantum-meruit claim seeks compensation for GWT's investment in "researching, developing, and preparing the ice cream

[8] There is one dispute as to the Agreement's scope. GWT argues that the terminations were invalid, and that the Agreement remains in full force and effect. Am. Compl. ¶ 113. WKK argues that the terminations were effective and that the Agreement thus was terminated on June 25, 2025. WKK Motion at 3. So, the parties dispute whether there has been an enforceable contract in effect since June 25, 2025. But GWT's quasi-contract claims are all based on conduct prior to the Termination Notices, *see* Am. Compl. ¶¶ 136-160, and GWT has not argued that the parties' dispute as to whether the Agreement remains in effect bears on those claims.

products for commercialization," Am. Compl. ¶ 154, the Agreement also governs who bears the cost for GWT's obligations, *see* Agreement § 3.14. Each quasi-contract claim is thus encompassed by a valid contract between the parties. *See Phillips 66 Co. v. Marine Petrobulk Ltd.*, No. 23-14-cv, 2023 WL 8800718, at *7 (2d Cir. Dec. 20, 2023) (summary order).

**4. Fraudulent Misrepresentation (Count 6)**

GWT's fraudulent-misrepresentation claim is likewise duplicative of its contract claim. "To state a claim for fraudulent misrepresentation under New York law a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (citation modified).

GWT challenges WKK's representations that "it would: (i) act in good faith and fairly in its dealings with GWT under the Agreement, including in considering and approving products ([Agreement] §23); (ii) use its 'reasonable discretion' in approving or disapproving production samples submitted by GWT ([Agreement] §6.3(e)); (iii) 'not grant rights to any third party to use the Property in connection with the manufacture, marketing or distribution of ice cream or frozen novelty products in the Territory during the Term' ([Agreement] §2.1); and (iv) provide GWT 20 business days to cure alleged material breaches of the Agreement ([Agreement] §13.1(xiii), (xiv))." Am. Compl. ¶ 162. GWT alleges that these statements were false because "WKK had no intention of fully performing its obligations under the [Agreement] at the time in [*sic*] entered into (and later amended) the [Agreement]." *Id.* ¶ 164. And it alleges that it was "damaged as a result of its reliance on WKK's fraudulent misrepresentations" because it spent "millions of dollars in out of pocket expenses into the development of its product samples" and "lost out on the sales that would have resulted if it could have commercialized the products." *Id.* ¶ 168. According to GWT,

these allegations state a claim for fraudulent misrepresentation because "New York law is clear that an action for fraud will lie when a defendant makes a promise that he has no present intention of performing." Opposition at 30 (quoting *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 794 (2d Cir. 1986)).

Under New York law, however, "a cause of action sounding in fraud cannot be maintained when the only fraud charged relates to a breach of contract." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 197 (S.D.N.Y. 2011). "[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quotation marks omitted). A plaintiff needs to allege "more than intentionally-false statements" indicating the defendant's "intent to perform under the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 19 (2d Cir. 1996). Instead, where a fraud claim is stated in conjunction with a breach-of-contract claim, a plaintiff must either: (i) "demonstrate a legal duty separate from the duty to perform under the contract"; (ii) "demonstrate a fraudulent misrepresentation collateral . . . to the contract"; or (iii) "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20.

As to the first scenario, GWT has not alleged any legal duty separate from the duty to perform under a contract. On the contrary, all four alleged misrepresentations are promises of performance stated in the Agreement itself. Am. Compl. ¶ 162. GWT may not "dress[] up" its "breach of contract claim by further alleging that [WKK] had no intention, at the time of the contract's making, to perform its obligations thereunder." *Telecom Int'l Am.*, 280 F.3d at 196

(citation omitted); *cf.* Am. Compl. ¶ 164 (alleging that "WKK had no intention of fully performing its obligations under the [Agreement]" at the time of the contract's making).

Nor are the obligations GWT identifies, which are expressly spelled out in the Agreement, "collateral . . . to the contract." *Bridgestone/Firestone*, 98 F.3d at 20. In arguing otherwise, GWT relies on a line of cases holding that misrepresentations about present facts are collateral to contractual promises of future performance. Opposition at 30 (collecting cases). New York courts have permitted breach-of-contract and fraud claims to proceed in tandem where the fraud claim was based on misrepresentations that breach an express warranty, because "[a] warranty is not a promise of performance, but a statement of present fact." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (citation omitted). This distinction does not help GWT. The alleged misrepresentations all involve promises of performance under the Agreement, not statements of present fact. Am. Compl. ¶ 162; *see id.* ¶ 164 (alleging that "WKK had no intention of fully performing its obligations under the [Agreement]"). True, one of those promises was phrased as a warranty: in Section 2.1 of the Agreement, WKK "warrants" that it "will not grant rights to any third party to use the Property." But this supposed warranty describes what WKK "will" do rather than making any statement of present fact. And to the extent that this warranty encompasses a statement of present fact, GWT does not allege that WKK had already transferred any rights either when the Agreement was first executed or when the amendment was negotiated. GWT has thus not alleged any misrepresentations about matters collateral to the Agreement.

The Amended Complaint also fails to satisfy the "special damages" exception. "To prevail under this exception, a [p]laintiff must show some loss independent of the damages allegedly incurred for breach of contract." *Serifos Mar. Corp. v. Glencore Singapore Pte Ltd.*, No. 22 Civ.

8012 (LGS), 2024 WL 824486, at *2 (S.D.N.Y. Feb. 15, 2024) (quotation marks omitted). In other words, "the plaintiff must show not that his damages were merely atypical, but that they were a special consequence of the fraud and can be separated from the damages they can claim because of the alleged breach of contract." *Maricultura Del Norte v. World Bus. Cap., Inc.*, 159 F. Supp. 3d 368, 378-79 (S.D.N.Y. 2015) (internal quotation marks omitted). In support of its fraudulent-misrepresentation claim, GWT alleges that it lost "millions of dollars in out of pocket expenses" in developing product samples under the Agreement. Am. Compl. ¶ 168. But one measure of damages for breach of contract, reliance damages, "allow[s] a plaintiff to recover 'his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract.'" *Abraham v. Leigh*, 471 F. Supp. 3d 540, 565 (S.D.N.Y. 2020) (quoting *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992)). GWT's claimed expenses are a classic measure of contract damages. And GWT's pleadings undercut any argument that the fraudulent-misrepresentation claim involves damages independent from those allegedly incurred for breach of contract, because GWT seeks the same damages for breach of contract as it does for fraudulent misrepresentation. *Compare* Am. Compl. ¶ 124, *with id.* ¶¶ 168-169.

GWT's contrary argument misunderstands the special damages exception. It notes that "[s]pecial damages 'compensate a plaintiff for losses other than the diminished value of the promised performance,'" such as out-of-pocket costs. Opposition at 30-31 (quoting *Bootie Beer Corp. v. Mercatus & Partners, Ltd.*, No. 06 Civ. 5983 (RMB), 2007 WL 9817955, at *5 (S.D.N.Y. Jan. 17, 2007)). So it argues that its claim for the "amounts it invested to research and develop products under the [Agreement]" are special damages. *Id.* at 31. But "New York law awards only 'out-of-pocket' expenses in fraud cases, entitling plaintiffs to damages solely for their actual pecuniary losses." *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993). Every fraud claim

is a claim for "special damages" in the sense GWT uses it. *Bridgestone/Firestone* makes clear that to satisfy the third exception, a plaintiff must "seek special damages" that are "*unrecoverable as contract damages.*" *Bridgestone/Firestone*, 98 F.3d at 20 (emphasis added). GWT has not shown that the damages it seeks are unrecoverable as contract damages.[9]

WKK's motion to dismiss thus is granted as to GWT's fraudulent-misrepresentation claim in Count 6 because this claim merely repackages the breach-of-contract claim. *See Roadzen, Inc. v. Meteora Cap. Partners, L.P.*, No. 25 Civ. 7867 (JPO), 2026 WL 1983435, at *7 (S.D.N.Y. July 9, 2026) (dismissing a fraud claim "predicated on the same conduct and seek[ing] the same relief as [the plaintiff's] contract claim").

**5. Declaratory Relief (Count 7)**

GWT's final claim against WKK seeks a declaration that the Agreement remains valid and enforceable. Am. Compl. ¶¶ 170-180. The Declaratory Judgment Act ("DJA") provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the

[9] Although neither party has raised this issue, the Court notes that Section 17 of the Agreement is an exculpation clause which provides that, except for breaches of Section 2.1, Kellogg "will not be liable . . . under contract, tort, negligence, strict liability, or other legal or equitable theory for any incidental, consequential, special, punitive, exemplary or other damages or lost profits." Agreement § 17. Several cases have held that a fraud claim satisfies the special-damages exception where a contract contains a clause limiting contract damages for nonperformance but not fraud damages. *See, e.g.*, *Bootie Beer*, 2007 WL 9817955, at *5 (permitting a fraud claim to proceed where the underlying agreements precluded the plaintiff "from seeking 'loss of profits or incidental, indirect, exemplary, punitive, special or consequential damages of any kind,'" since the fraud claim therefore sought damages that would not be recoverable under a breach-of-contract claim); *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (concluding that "fraud damages would not necessarily be duplicative of the contract damages" where "the contractual damages are capped" by the agreement). But unlike the agreement in *Vtech Holdings*, which capped damages for breach-of-contract claims "with an exception for 'intentional tort and willful misrepresentation,'" 172 F. Supp. 2d at 441, Section 17 limits damages "under contract, tort, negligence, strict liability, or other legal or equitable theory," Agreement § 17. Whatever its ultimate effect, Section 17 provides no basis for distinguishing GWT's fraud damages from its contract damages.

filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he DJA provides only that federal courts '*may* declare the rights and other legal relations of an[] interested party seeking such declaration' in 'a case of actual controversy'– not that they *must* so declare," so the Second Circuit has "consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 96 (2d Cir. 2023) (quoting first 28 U.S.C. § 2201(a) then *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003)).

"Courts routinely dismiss requests for declaratory judgment when the parties' rights will be adjudicated through a breach of contract claim in the same action." *Talkdesk*, 2024 WL 4904684, at *6 (citation modified). This is because "[d]eclaratory relief is a prospective remedy intended to resolve or mitigate disputes that may yield later litigation." *Fin. Tech. Partners LP v. Circle Internet Fin. Ltd.*, No. 24 Civ. 4717 (VM), 2025 WL 897133, at *4 (S.D.N.Y. Mar. 24, 2025) (internal quotation marks omitted). Where the parties' rights will be adjudicated through a breach-of-contract claim, "a declaratory judgment will not clarify or settle the pertinent legal issues or finalize the controversy." *Id.* That is the case here. Count 7 seeks a declaration based on the dispute between the parties "concerning whether WKK has terminated the [Agreement] and whether GWT still has a license to use the Property to design, manufacture, distribute, market, and sell Licensed Products." Am. Compl. ¶ 171. But the breach-of-contract claim alleges that the Termination Notices were invalid and that the Agreement is still in force. *Id.* ¶¶ 106, 116. A declaratory judgment will not clarify or settle issues other than those that will be adjudicated through the breach-of-contract claim.

GWT argues that "a declaration would serve the useful purpose of definitively [deciding] whether GWT retains an exclusive license to use the Property and whether WKK's assignment to Ferrero was valid." Opposition at 49-50. But whether the Agreement was validly terminated is the core of GWT's breach-of-contract claim. Resolving that claim requires deciding whether WKK had the right to terminate the Agreement. If WKK's termination was a breach, Count 1 will also address the legal consequences of that breach, including whether the Agreement remains in effect. And whether WKK permissibly assigned the Property to Ferrero depends, in part, on whether WKK's termination was valid. "Granting [GWT] this remedy would serve no purpose because the claim for declaratory judgment would not clarify any uncertainty in the parties' legal relations that would otherwise remain unresolved as part of the breach of contract claim." *Talkdesk*, 2024 WL 4904684, at *6 (citation modified).

The Court therefore declines to exercise its jurisdiction to issue a declaratory judgment, and WKK's motion is granted as to Count 7.

## IV. Conclusion

For the foregoing reasons, the Court grants Ferrero's motion to dismiss GWT's claims for lack of personal jurisdiction. GWT's claims against Ferrero are dismissed without prejudice to refiling in a court that has personal jurisdiction over Ferrero. This includes dismissal without prejudice of Count 8 in its entirety. WKK's motion to dismiss Count 1 is denied. WKK's motion to dismiss Counts 2 through 7 is granted and those claims are dismissed without prejudice. Because the Court is able to resolve Defendants' motions without oral argument, their request for argument, Dkt. 69, is denied as moot.

The parties are directed to meet and confer in good faith regarding their outstanding discovery disputes in light of this Opinion and Order. The parties shall submit a joint letter by

November 18, 2026, apprising the Court of their positions on whether further discovery is necessary and whether any discovery disputes remain. The Clerk of Court is respectfully directed to terminate Ferrero International S.A. as a Defendant and to close Docket Numbers 50, 52, 65, 67, and 69.

SO ORDERED.

Dated: November 10, 2026
New York, New York

JOHN P. CRONAN
United States District Judge